Please be seated. Good afternoon, everyone. We have four cases on the argument calendar this afternoon. I've been advised by our courtroom deputy that all those arguing are present in the courtroom. I know we have one attorney appearing by way of Zoom, so we will dispense with the calling of the calendar and proceed to argument on the first case. I think you know this already with respect to the COVID protocol. When the attorney is arguing, if he or she wishes to, they can take off the mask. And once you're done arguing, obviously, you should put the mask back on. All right. So we'll proceed with the argument on the first case, Cimontubo v. Petroleos De Venezuela. Ms. Livingston, I see you reserve two minutes for rebuttal. So you can begin when ever you're ready. Good afternoon. Thank you, Your Honor. I'm Justice Livingston on behalf of Petroleos De Venezuela, S.A. Petibas, I ask this Court to reverse the District Court's grant of summary judgment in favor of Petelvis, Cimontubo, for Cimontubo for two reasons. But before I get to those two reasons, I want to touch on the question of the courts of public jurisdiction as raised by Ms. Cimontubo. Ms. Cimontubo argues that Petelvis' appeal is premature and that its notice of appeal is not liable to relate forward to the final judgment issued on November 30th. But that is incorrect. The timing of a couple of the motions and the reporters that were entered is important, but also the content of Petelvis' notice of appeal is important. I'm sorry. Would you mind just either tilting the microphones up or just keeping your voice up? I'm having a little trouble hearing things. My apologies, Your Honor. Is this better? Yes, thank you. Great. On the timing question, the District Court entered its order granting Cimontubo summary judgment on March 4th, 2021. Two weeks later, Petelvis filed a motion for reconsideration, and a few weeks after that, on April 5th, filed its notice of appeal to support. Understandably, the District Court in its motion is granting a summary judgment reserved to the magistrate at inquest on attorneys' fees, costs, and interests, and the magistrate entered an R&R on that on June 17th. At the time, the District Court did not immediately approve or deny the R&R, and so Petelvis moved with this order to stay the appeal, which the Court did, until November 1, when the District Court ruled on the motion for reconsideration and denied that. Petelvis then alerted this Court to the fact that that pending motion for reconsideration had been resolved, but further asked that the Court continue to stay because of the unresolved ruling on the magistrate's R&R on interests. But this Court instead, the next day, lifted the stay and ordered Petelvis to file its appeal. However, in the time between when this Court lifted the stay and when Petelvis did file its appeal, the District Court resolved and approved the R&R and then entered a judgment on November 3rd. So the bottom line is, even if the November, excuse me, even if the March 4th order was non-final, it has ripened? Exactly. Okay. All right. Why don't you proceed to the substance of your argument? Absolutely. So on the merits of Petelvis' appeal, the District Court abused its discretion in two ways. The first is that the District Court ruled contrary to well-established law that a defendant be given an adequate opportunity to discover essential facts on a position to rule in a summary judgment. That general principle was laid out by the United States Supreme Court in Stella Texas and should be liberally lobbied on and refined by this Court in cases such as Berger. But, Ms. Livingston, the District did do that. There was a period of time, obviously, the letters of obituary were issued. The District Court said, February 1, I'm going to move forward one way or the other, right? Whichever happens first, I think was the way he phrased it. You didn't object, the counsel didn't object at that time to that timeframe. And then this is the part that I want you to address. The deadline just goes by. There was no request for an extension of time of that February 1 date. It just goes by without anybody saying we're still waiting for these letters of obituary. And in fact, it was only when they told the judge, look, that deadline has gone by, that a letter was put in indicating that for the first time local counsel in Portugal was contacted to find out what was going on. So nobody was checking for three months, whatever it was, three months, two months, two months, on what was going on. So why was that then, under those circumstances, was it an abuse of discretion for the District Court to say, I'm not going to, there was no indication it's going to be only a few more weeks. Basically, it appeared that they forgot about it in Portugal. You can correct me if I'm wrong. And that it could be many, many, many more months as a result. So that's part of the record that I really want you to address. Yeah, absolutely, Your Honor. It's a long question, but... No, that's fine. I agree that there is some question about what, you know, what sort of happened in the timing of... First of all, why wasn't there a request for an extension of time before the deadline passed? Wouldn't that have been the way it normally would work? Judge, please extend the deadline. Instead, the deadline just passes with silence, right? Yeah, I believe that some information was coming in. So I'm not entirely sure why the request was made on or before February 1. Could you just, on that point, you said you believe some information was coming in. Yes. Are you referring to the record or is this some, are you just making representations about stuff that's not in the record? No, the response from Bank of the ICC and on January 21, 2021, so before the February 1 deadline, and I apologize, I don't have which letter and... Back to Judge Bianco's question, why was there no request for more time? You know, the deadline approached and no one wrote in and said, we need more time to do this. You're right, Judge, and there was no request right before the February 1 deadline for specific costs, but there were briefing letters... So why would it not, why, how is it an abuse of discretion if Judge Daniels wasn't asked to give more time? Well, respectfully, he was in letters admittedly after the deadline... Well, suppose he had just decided on February 2. You couldn't stand here and say it was an abuse of discretion on February 2 for him to move forward if he told you he was going to move forward on February 1, and nobody said anything otherwise, right? That's probably true, but that's not what happened. Well, also, you mentioned earlier the denial of reconsideration. That's not until November, so many more months have gone by, and at that point, Judge Daniels says, nothing else has been brought to my attention. And so at that point, you're talking 18, or a year and a half, and nothing else has come in. Um, I believe it would have been like 11 months, not quite a year and a half. Well, from the time, from the time the case was removed was July of 2020. You could have served discovery requests right then and there if you wanted to. There's no, there's no automatic stay of discovery, and then, and then the decision is made in March 4th, and then another eight months go by. So when you look at that entire period, you're, you're, you're talking about 15 months of, of time. Isn't that a full and fair opportunity in which to conduct your discovery? Respectfully, we would say that it was not. I don't believe that there are facts necessarily in the record about what had any correspondence with the Portuguese court on the letters um, after the, you know, the ruling, not summary judgment, but in between the February and, uh, 4th and 5th time periods of letters were being submitted to the district court, and the district court's ruling on March 4th. I know there was, you know, investigation by, uh, I guess. I know, but then there was, there was, um, six or seven more months after that where nothing happened. If there was, if there was, as was represented to the court, going to be expedited requests to the Portuguese court to move forward on this. At the time of the denial of the motion for consideration, that was another seven months, and there's nothing in the record of if, in fact, they went forward with the expedited motion, what was going on. Do you have any, any, uh, response to that? Like, I'm just following up on Judge Chin. It seems that, you know, you say to the judge, don't decide this yet. We're going to do an expedited motion, and then six or seven months later, when he decides the motion for consideration, there's still no result from that expedited motion. Is there an answer to that? My understanding is that Portuguese court was not going to move forward after learning that there had been an entry of, um, summary judgment. So, it was, it was as if it would have been withdrawn? Uh, that's my understanding, but I can get back to you. No, it's not on the record, I guess. So, but, all right. Thank you. Mr. Reback. Good afternoon. My name is Corey. Um, this is Rick Reback from the Los Angeles LLP, representing the appellate. Uh, if I could just make one note at the outset. Uh, the final point in our brief is that the guarantor, that's what we call the defensive sub, uh, is plainly liable under Section 164 of the note agreement, which is on page 76 of the appendix, uh, and addressed a ransommary order that came down to this court on July 20th, uh, on July 9th of last year, which construed a note agreement pretty much identical to the one that's in the two-vote. And I just replied in this deal, uh, didn't even mention anything about the guarantor. So, uh, I submit respectfully that that much is established and not contested. Um, on appellate jurisdiction, I'll just have a couple of words. Uh, the word ripen, and I don't want to belabor the metaphor too much, but the word ripen, as I said in the case, uh, that's not what happened here. It wasn't just that things happened in the court in the normal course where things had already been decided or things that already had been briefed and submitted just went through their normal course and the judge acted on it and it works. Here, we had actual contested litigation for, I think, about a month and a half, and that's true. I don't, that may be true, but I don't know if that's, uh, makes it distinguishable under the rule. If it ripens, whether naturally or through additional litigation, it still ripened into a final judgment. And the question on that issue would be, is there any prejudice to your client by allowing it to go up on appeal now that it has ripened? And I don't think there's any prejudice, right? You're not claiming there's any prejudice to your client, right? We're not claiming there's any prejudice, Your Honor. Uh, we're just making the point that the rules are what the rules are, and under the case law, we went back, I, I checked pocket sheets, you know, all the cases that got cited, and I can go through the Berlin case and the Sweet case and the Zip case, and in all of them, there was no additional actual contested litigation on the claim that came up to this court after the notice was appealed. But if the contested litigation is on things unrelated to what we're here arguing about, then there's no prejudice. That's the key. That's why there's ripen and prejudice. But why don't you move on to the other argument? Okay, I'll, I'll move on. Um, the court of, the core of Pennesa's appeal here is that it wasn't given sufficient opportunity to take discovery, and that puts the cart before the horse. Because there's two hurdles that Pennesa has to jump before we can even talk about discovery, and Pennesa can't clear either one. First, they would need to show that the discovery would actually establish a defense if things came out the way Pennesa thought they would. And second, that they took credible steps to obtain facts to support the defense. Now, if you look at why Judge Daniels suggested that the subpoenas issued to the two banks, if you look at the record, um, pages 42 to 44 of the transcript, which is the pages 15 to 17 of the appendix, I had a long interchange with him. And he said, if the issue is against the banks and they come back blank and there's nothing there, isn't that conclusive that you win? And I said, yes, that's true, but even if something comes back, it still doesn't establish a possibility. Now, in fact, performance never was impossible because, first and foremost, we don't know if it wasn't impossible because the sanctions don't apply to some people. Could payment also have been made in euros? Was that another option, payment in euros? Would that have been affected by the sanctions? Well, as it turns out, the two payments that were made after sanctions were made in euros. But in euros. Well, I guess my question is, doesn't the impossibility defense fail because they could have made payment in euros, which would have been unaffected by sanctions? Is that right? Now, that's one reason. Because one of the things that Mr. Tracy was having to tap on below was this is dollar-denominated debt and all dollar-denominated debt has to go through the US. But the note agreement specifically does contemplate that payment could be made in other currencies. The other thing is, it isn't just that these particular—even if there was some hesitation by these banks, if there had been, say, for example, a refused payment, what Benefice would have had to show was there's no bank, not in Europe, not in the US, not anywhere else in the world, that would do this. And if things actually became to that, they would have been able to prove it. They would then have to show they couldn't have brought gold or bitcoin or whatever. The standard under the New York Court of Appeals Kelvin case and related cases relating to impracticability and impossibility of performance is very high. You have to show that it is literally physically impossible for anybody to perform according to what is required in the contract that's set forth there. The other thing is this. The issue that's causing the problem, that's the basis for the impossibility claim, has to be unforeseeable. It was made very clear by the New York Court of Appeals in California. And we have a situation here where the year before this note agreement was entered into, there were more limited sanctions, but some sanctions imposed on various property and persons in Venezuela. And, you know, the note agreement provided for payment not in dollars if it became necessary. So the circumstance in which it would be difficult to make dollars-nominated payments was not unforeseen. Back on the discovery issue, did anything ever come back from the third bank? I don't know if there's anything in the record. Not that I'm aware of. But what came back from the first bank, there were some limited discovery that came back from the first bank that came, I believe, that the Federal Basis Council notified NIFID on February 1 or February 2, something like that. And within a day or two, I sent a letter to the judge saying, well, this is what came back from Portugal. And they are saying nothing ever hit their system to show that there was a payment refused. Then we had some back and forth about what it is. But that was a letter from the court, which I believe is to give you the exact – Well, yeah, and then there was a response from a second bank, as I understand it. But it wasn't clear to me whether the third bank ever responded while the case was pending. I thought the third bank transferred. It was a transfer of a successor bank, right? It wasn't – isn't that Nova Bank? The bank – Banco – Banco Sergio Santos was the bank that made the two payments in euros after sanctions were imposed. Banco Sergio Santos was in, I guess, the equivalent – the Portuguese equivalent of the receivership. Right. And – Transferred its business. Their active business was transferred over to Nova Banco. So there were really only two banks at that point that would have records potentially that they would want, the BIC and Nova Banco, right? And they got BIC. The thing that I didn't really – I didn't really understand. I'm not sure it matters ultimately. But the district court said because one bank came back negative that it made it more or less – more unlikely, I guess, that they could find such a record in the bank that they were waiting for, Nova Banco. I don't know that that follows, right? Just because one bank didn't have a record of an attempted transaction doesn't make it more or less likely that a completely independent bank would have such a record, right? Well, when a wire gets sent, I would guess they're – I'm not a banker. No, but they're saying they didn't – maybe they used different banks. They weren't sure which bank may have the record. So they wanted records from both banks. The fact that one bank didn't have it in the record doesn't necessarily mean the other bank doesn't have it. Well, it might because the transfer would go electronically from Nova Banco to EuroBIC. EuroBIC is saying it never hit our system. Now, I suppose it's hypothetically possible that something would have tried to get out of Nova Banco and then arrested before it left that bank. I didn't understand it that way. Hypothetically, that couldn't happen. I don't know mechanically what the mechanics would be. But it seems to me, and I think to Josh Daniels as well, that if a bank tries to send a wire to me – if banking tries to send a wire to Bank B, Bank B would learn that the wire was coming in and maybe something would happen in the interim. But I have 10 seconds left. All right. Thanks. Thank you. All right, Mr. Livingston, you have two minutes in rebuttal. Can you just address that last point? Did the banks send it through each other or they would have sent it potentially independently? Or would they have worked together? Yes, Your Honor, I was going to start there. Okay. So your question is important because Nova Banco is the originator bank. It's a ten-basis bank that would have then initiated the outbound transfer. But would it have gone through BIC then or not? It's likely it would have gone through an intermediary bank. And that is because if it was a dollar-denominated initiation, it would have to go through a U.S. correspondent bank in order to be then transferred. And so that's part of the issue. I understand Simo Tubo – Simo Tubo's argument is that because these are both Portuguese banks, it could have gone directly from one Portuguese bank to another, but not if it was a dollar-denominated transfer. And so that's why not only is it important to know – you wouldn't know from the receiving bank end whether – where in the process it had been rejected. And that's why the information in this summary from Nova Banco was so critical and important. And that's information that was not – that was not fully developed. Two other quick points – three, actually, quick points on that. The question about payment in euros. I think I should change the question. Section 9.05 of the note does not actually state that payment can be made in other denominations. It states that payment can only be made solely and exclusively in dollars. And then it states that if it becomes necessary to convert into dollars an amount in another currency, here's the process for doing that. Not it can be converted into another currency. That's important because the dollar-denominated requirement means that we – excuse me – there was arguments about why would the sanctions specifically apply based on them not being a U.S. person and the note – the debt being not new debt. But two of the payments have been made in euros, right? Two payments were made in euros. That's correct. And we don't know from the record why. But the sanctions order statistically states that efforts to circumvent the order are in themselves a violation of sanctions. And that would be something like trying to make payment in a denomination to a sanctioned entity to avoid the U.S. transaction aspect of it. And banks are hypercritical of that. That's part of the issue is that even if it's not a U.S. person, even if it's not new debt, there have been in other cases based on the same sanctions questions, banks that have, for reputational purposes, said we will not process these payments for any reason because of the concern over these sanctions. We're not going to do the diligence to determine whether or not this was a U.S. person or not. And so that's part of the issue is that it's very possible NovoBanco or an intermediary bank processing those payments could have said exactly that. All right. Thank you. Thank you very much to you, to both of you, and we'll reserve the decision. Have a good day.